**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| LUIS MANSO, | : | |
| | : | Civ. No. 16-2336 (CCC) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CINDY SWEENEY, THE ATTORNEY | : | |
| GENERAL OF THE STATE OF NEW | : | |
| JERSEY | : | |
| | : | |
| Respondents. | : | |
| | : | |

**CECCHI, District Judge**

## I.   INTRODUCTION

Before the Court is *pro se* petitioner Luis Manso's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF Nos. 1 & 3.[1] For the reasons below, Manso's habeas petition is denied and he is denied a certificate of appealability.

## II.   BACKGROUND

### A.  Factual Background

Manso's conviction arises from his involvement in two gang-related kidnappings and murders. The facts are set forth in greater detail in the opinion of the Superior Court of New Jersey, Appellate Division, on Manso's appeal of the denial of his first petition for post-conviction relief ("PCR"):[2]

---

[1] Manso filed his first petition on the wrong form. ECF No. 1. The Court ordered the Clerk of the Court to provide him with the proper form. ECF No. 2. Manso thereafter filed his second petition on the proper form. ECF No. 3. The two petitions contain identical claims.

[2] Pursuant to 28 U.S.C. § 2254(e)(1), this Court affords deference to the factual determinations of the State court. *Id.* ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue

[Manso and nine codefendants[3]] were members of the Latin Kings. According to [David] Martinez, who pled guilty to conspiracy to commit murder in exchange for a five-year sentence, [Charles] Byrd was the highest-ranking Latin King in New Jersey. [Michael] Romero was next in line. He was chairman of the statewide Crown Council, which Martinez characterized as a court consisting of the chairs of the six regional crown councils.

There were four regional officers below the state officers. Manso was a regional officer with oversight of the local chapters in Elizabeth, Perth Amboy, and Newark. Manso established the Orange Crush, which was an elite enforcement group appointed by him to handle special problems. Martinez and [Jose Antonio] Perez were members of the Orange Crush. Luis Rodriguez testified that he had been the head of Orange Crush "[a]t one time."

Each local chapter had a First Crown, who was in overall charge; a Second Crown, who assisted the First Crown; a Third Crown, who acted as an enforcer;[4] a Fourth Crown, who acted as secretary; and a Fifth Crown, who was the treasurer. [Jesus] Rodriguez was the First Crown in Newark. [Edmund (or Edwin)] Rivera was the First Crown in Jersey City. [Ricardo] Diaz was the Enforcer for Paterson. Martinez was the Enforcer for Elizabeth.

According to Martinez, Romero held a meeting of Latin Kings members at his home in Jersey City on June 29[, 1998]. He explained that, on the previous day, Omar D. Morante (Morante) and Jimmy Cabrera had conducted a drive-by shooting at the apartment complex where he lived. Romero believed that he had been the intended target of the shooting. He wanted the Latin Kings to retaliate on his behalf. Byrd, who was at the meeting, agreed to Romero's request. He ordered the Orange Crush to kidnap Morante and Cabrera that night, break their shooting arms, and then kill them.

Later in the day, there was a meeting of approximately twenty-five Latin Kings at Romero's home. Jose Torres, an Orange Crush member, Martinez, Manso, and Perez left the meeting, picked up Omar W. Morante and Juan Cortes, and brought them to Romero's house. Other Latin King members brought Morante and Cabrera

---

made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

[3] Some individuals involved in this case share the same last name. As the Appellate Division did, the Court refers to those mentioned less frequently by their full names to avoid confusion.

[4] An enforcer's role was to take care of problems outside the chapter and administer "violations" or "physicals" (beatings) to members who broke rules. The beatings varied in scope and ranged from head to toe or more limited areas of the body, as well as length of time and number of attackers. The most severe "physical" involved being beaten by five men for five minutes, but was not intended to result in death. *State v. Manso*, No. A-2646-12T1, 2015 WL 5038096, at *1 n.3 (N.J. Super. Ct. App. Div. Aug. 26, 2015).

to Romero's house.[5] Diaz testified that Romero, Manso, and Rivera discussed the situation privately. Juan DeJesus (DeJesus) overheard them trying to dissuade Manso from carrying out Byrd's order, but he responded that "an order is an order."

After the meeting, Martinez drove Rivera's Ford Bronco, with Rivera, Torres, Cortes, and Omar W. Morante as passengers. Manso drove his car, with Romero, Perez, and Morante as passengers. DeJesus drove Rodriguez's vehicle, with Rodriguez, Luis Rodriguez, Diaz, Cabrera, and [Sfand] Rajabzaden as passengers.

Because Martinez was not sure of their destination in Newark, he pulled over near an interchange on the New Jersey Turnpike. The other cars followed. Manso used the pay phones at the interchange to call Byrd and confirm that their orders were to carry out the punishment without a trial. According to Martinez, while Manso was speaking to Byrd, Luis Rodriguez asked to speak to Byrd to persuade him that a trial was necessary, but Manso told him Byrd refused to reconsider the issue. According to DeJesus, when Manso hung up the phone, he said, "Byrd said we got to do this."[6]

While they were stopped at the tollbooth, Omar W. Morante received permission to leave the car to use the bathroom. Instead, he went to a nearby Turnpike office and asked someone to call the State Police. Cortes was subsequently released. Martinez and the others concluded it was too risky to kill him because he had been seen by toll collectors with some of the defendants during the stop.

Two eyewitnesses to the murders testified for the State, Diaz and Luis Rodriguez. Although Diaz's and Luis Rodriguez's versions of the circumstances surrounding the murders of Morante and Cabrera differed to some extent, they testified that Rodriguez and Romero directly participated in the killings. They also testified that Manso was at the scene and said, "Set it off," after which the attack began. Diaz further testified that Manso directed him to drag Cabrera's body to the water, which he did. According to Luis Rodriguez, Manso ordered him to help Perez drown Morante, but he refused.

DeJesus also testified for the State. He confirmed Martinez's account of the Turnpike stop and Manso's call to Byrd. He explained that he stayed in the car at the scene of the attack because Rodriguez had told him to do so. DeJesus did not witness the murders. He testified, however, that he saw the others run out of the bushes all sweaty and dirty.

---

[5] The two Morantes and Cabrera were brothers. *Manso*, 2015 WL 5038096, at *2 n.4.

[6] The defendants stipulated that a call was placed from Byrd's place of employment to a pay phone at Exit 14C of the Turnpike on the night of the murders. *Manso*, 2015 WL 5038096 at *2 n.5.

*State v. Manso*, No. A-2646-12T1, 2015 WL 5038096, at *1–2 (N.J. Super. Ct. App. Div. Aug. 26, 2015) (footnotes and internal brackets omitted).

### B. Procedural History

In November 1998, Manso and nine codefendants were indicted in New Jersey state court and charged with multiple counts of kidnapping, murder, and related offenses. *Manso*, 2015 WL 5038096, at *1. Manso and four codefendants were tried jointly in early 2000. *Id.* Manso was convicted on all counts and sentenced to 60 years. *Id.* In April 2004, the New Jersey Appellate Division affirmed. ECF No. 9-43 & 9-44 (*State v. Romero*, Nos. A–4974–99, A–6593–99, A–0282–00, A–0834–00, A–5704–00 (App. Div. Apr. 12, 2004) (slip op. at 1–118)). Manso's petition for certification was denied in September 2004. *State v. Manso*, 859 A.2d 692 (N.J. 2004).

In April 2005, Manso filed a PCR petition. *Manso*, 2015 WL 5038096, at *2. A PCR judge held an evidentiary hearing[7] on three days in 2011 on Manso's petition and those of three co-defendants. In a January 2013 written opinion, the PCR judge denied relief and dismissed the petitions. *Id.* at *3. The Appellate Division affirmed in August 2015. *Id.* Certification was denied in February 2016. *State v. Manso*, 130 A.3d 1247 (N.J. 2016).

In April 2016, Manso filed the instant petition. He asserts the following grounds for relief: (1) ineffective assistance of counsel, ECF No. 3 at 8–9; (2) newly discovered evidence, *id.* at 12; (3) improper jury instruction on cooperating witnesses, *id.* at 14; (4) prosecutorial misconduct, *id.* at 17; (5) jury misconduct, *id.* at 19; (6) improper jury instructions, *id.* at 20; (7) improper omission of a limiting instruction on "propensity" and "other crimes evidence," *id.* at 21; (8) the trial court's failure to voir dire the jury as to the reasonable doubt standard, *id.* at 22; and (9) trial court error in denying his acquittal motion, *id.* at 23.

---

[7] Manso's lawyer, Sampson, died before the PCR hearing. *Manso*, 2015 WL 5038096, at *5 n.8.

In May 2017, the State answered, arguing, inter alia, that Manso failed to exhaust certain claims. ECF No. 9 at 47. In March 2018, Manso requested a stay to exhaust his state claims, which the Court granted in June 2018. ECF Nos. 14 & 15. Manso then filed his second PCR petition. In November 2018, the second PCR judge (1) denied Manso's request for an attorney and (2) found the petition was time-barred.  ECF No. 30-1.  In April 2020, the Appellate Division affirmed. *State v. Manso*, No. A-1568-18T1, 2020 WL 1809794, at *1 (N.J. Super. Ct. App. Div. Apr. 9, 2020). Certification was denied in April 2020. *State v. Manso*, 240 A.3d 407 (N.J. 2020).

In December 2020, Manso informed the Court that he had exhausted and requested that the stay be lifted (ECF No. 26); the stay was then lifted (ECF No. 27); and the State filed a supplemental answer in February 2021 (ECF No. 30). Manso replied in July 2022 (ECF No. 39).

## III.   LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996, the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner must establish his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). District courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010).

If the state courts have adjudicated a claim on the merits, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is "clearly established" if it is clearly expressed in "the holdings, as opposed to the dicta" of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id*. If a petitioner challenges a state court's allegedly erroneous factual determination, the state court's determination "shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under these standards, the relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). These standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

In addition to the above, a federal court may not grant the writ unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (quotation marks and citation omitted). To the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits. *See* 28 U.S.C. § 2254(b)(2); *Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

## IV.    DISCUSSION

### A.  Ground One: Ineffective Assistance of Counsel

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim of ineffective assistance has two necessary components. *Id*. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," *id.* at 687–88, meaning he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Second, a petitioner must establish prejudice, i.e., a reasonable probability that the result of trial would have been different absent the deficient act or omission. *Id.* at 687.

On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### 1.  Ineffective Assistance of Counsel by Failing to Call Key Witnesses and Properly Investigate Witnesses

In Ground One's first sub-part, Manso argues that his trial counsel was ineffective because he "failed to call Juan Cruz and Luis DeJesus," who allegedly "would have testified that one of the key state witnesses, Luis Rodriguez, was not truthful when he testified at trial." ECF No. 3 at 8. Manso asserts that "trial counsel never called them to testify even though they were willing to do so." *Id.* He also contends that trial counsel failed to do "a thorough investigation" by failing to review State witness statements and interview an individual, Elizabeth Salinas, who was living with Jesus Rodriguez at the relevant time. *Id.*

On appeal of denial of Manso's first PCR petition, the Appellate Division summarized the PCR hearing testimony relevant to this claim as follows:

Cruz testified at the PCR hearing. While he and Luis Rodriguez were incarcerated in the Essex County Jail, Luis Rodriguez told him that he had "completely fabricated" all of his testimony against Manso because "that's what . . . [the State] wanted to hear." According to Cruz, Luis Rodriguez also claimed that he had been given the statements of witnesses who had already testified so his testimony would be consistent. Cruz further testified that in 2001, while they were both at Trenton State Prison, Luis Rodriguez told him that he intended to provide truthful testimony once he was released from prison, but that he feared a recantation before then would adversely affect the terms of his plea bargain. Luis Rodriguez himself was not called as a witness at the PCR hearing.

Cruz acknowledged that he had been convicted of murder and was serving a ninety-nine year sentence. He also admitted to other convictions, including burglary, attempted theft, and aggravated assault. He denied belonging to the Latin Kings.

Luis DeJesus testified that he had been incarcerated with Luis Rodriguez, in Essex County Jail from 1998 to 2000. Luis Rodriguez told him that he had testified falsely at Manso's trial. At some point between April and June 2009, Luis DeJesus told Manso that he was willing to testify about his conversation with Luis Rodriguez because he believed that it was the "[r]ight thing to do." He confirmed that Sampson had not contacted him.

Luis DeJesus acknowledged that he had been convicted of felony murder and was serving a sixty-four[-]year sentence. He also admitted belonging to the Latin Kings in Newark.

*Manso*, 2015 WL 5038096, at *5–6 (alterations in original).

The Appellate Division also quoted the following passage from the PCR court's opinion:

> Assuming *arguendo* that the late defense counsel, Ronald Sampson, was furnished with the oral statements of [Luis Rodriguez] as related to the two witnesses, the decision to "not call" the witnesses would have been a clear tactical determination. First, the testimony was inadmissible hearsay. Second, given the lengthy criminal history of each, including homicide convictions, their credibility was nil. Third, neither was a neutral witness but rather members of the Latin King criminal enterprise. Fourth, the content of their remarks and demeanor on the witness stand during the PCR proceeding leads this court to conclude that neither were credible. Indeed, the more reasonable assessment is that "they lied" to save their Latin King comrade.

*Manso*, 2015 WL 5038096, at *6 (alteration in original).

The Appellate Division found no error in the PCR judge's ruling,[8] noting (1) the trial judge "had the opportunity to observe and hear [Cruz's and Luis DeJesus's] testimony" and (2) at trial, "Sampson attacked Luis Rodriguez's credibility through cross-examination, by establishing that he had cooperated with the State in hopes of obtaining a favorable plea bargain, without running the risk of calling Cruz and Luis DeJesus and having them turn out to be damaging witnesses, as they were at the PCR hearing." *Manso*, 2015 WL 5038096, at *6–7 (footnotes omitted). And even if there was error, the court found Manso did not demonstrate prejudice. *Id.* at *7.

The Appellate Division correctly articulated the *Strickland* standard and reasonably applied it to Manso's case. This Court will not revisit the state courts' credibility determinations. *Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir. 2000) ("The federal habeas statute provides us no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by us.") (internal quotation marks and alterations omitted); *see also Weeks*, 219 F.3d at 258 (on habeas review, the Court defers to state court credibility findings).

Given the finding that Cruz and Luis DeJesus lacked credibility due to, among other issues, their extensive criminal histories, defense counsel's decision not to call them at trial does not fall "outside the wide range of professional competent assistance." *Strickland*, 466 U.S. at 690; *Henderson v. DiGuglielmo*, 138 F. App.'x 463, 469 (3d Cir. 2005) ("Counsel's failure to call a witness 'is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing.'"); *Diggs v. Owens*, 833 F.2d 439, 446 (3d Cir. 1987). Accordingly, the Appellate Division's decision was not an unreasonable application of *Strickland*.

---

[8] The Appellate Division noted, however, that the record does not support the PCR judge's assumption that Cruz was a Latin King. *Manso*, 2015 WL 5038096, at *6 n.9.

The Appellate Division also reasonably determined that even if Sampson had failed to investigate these potential witnesses, there is no reason to believe he would have called them because, for the reasons discussed above, their testimony "would have had a negative and devastating impact on the defense of not only Manso, but all the Latin King trial defendants." *Manso*, 2015 WL 5038096, at *6; *see also Henderson*, 138 F. App'x at 470 (counsel's decision not to introduce testimony potentially in conflict with defense strategy is not unreasonable); *Curry v. United States*, No. 11-5800, 2015 WL 733274, at *13 n.19 (D.N.J. Feb. 20, 2015) (no ineffective assistance where the witnesses petitioner alleged should have been called "had criminal records, were charged co-defendants, or unindicted co-conspirators in the charged crime" and "[a]s such they would have been subject to withering cross-examination likely damaging to [petitioner]").

Further, in an effort to cast doubt on Luis Rodriguez's credibility at trial—which Manso believes the testimony of Cruz and Luis DeJesus would have accomplished—trial counsel established that Luis Rodriguez had cooperated with the State in hopes of obtaining a favorable plea bargain. Employing this strategy rather than "running the risk of calling Cruz and Luis DeJesus and having them turn out to be damaging witnesses, as they were at the PCR hearing" does not violate the *Strickland* standard. *See United States v. Napoli*, Civ. No. 11–6353, 2012 WL 4459584, at *6 (E.D. Pa. Sept. 26, 2012) ("Counsel cannot be deemed ineffective for failing to call a witness where there is good reason to question the witness's credibility and the witness would be vulnerable to cross examination on damaging evidence.") (citation omitted).

Even if there were error, in light of (1) the findings that Cruz and Luis DeJesus lacked credibility at the PCR hearing and would have lacked credibility at trial, (2) trial counsel's attempt, on cross examination, to impugn the credibility of Luis Rodriguez, and (3) the strong evidence of Manso's guilt, Manso has not established prejudice. Manso has not established that, but for trial

counsel's alleged failure to investigate and/or call Cruz or Luis DeJesus as witnesses, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

Manso's claims that his lawyer failed to investigate by not reviewing State witness statements and interviewing Salinas fail for the same reason; he has not established prejudice. When a petitioner's claim of failure to investigate is based on counsel's failure to investigate or call a certain witness at trial, a showing of prejudice has an additional requirement–the provision of a sworn affidavit or testimony from the witness regarding what information the witness would have provided had they been called at trial. *See Judge v. United States*, 119 F. Supp. 3d 270, 285 (D.N.J. 2015). Because a showing of prejudice in this context "may not be based on mere speculation about what . . . witnesses . . . might have said," *Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001), a petitioner's failure to provide a sworn statement from the alleged witness is fatal to the petitioner's ability to establish prejudice based on the failure to call that witness. *Judge*, 119 F. Supp. 3d at 285; *see also Suttle v. Davis*, No. 19-17041, 2022 WL 17705934, at *11 (D.N.J. Dec. 15, 2022) ("Where a petitioner asks the court to 'speculate both as to whether [the witnesses] would have in fact have testified on his behalf and as to what [the witnesses'] testimony would have been,' rather than presents the court with sworn testimony, he will not be able to establish prejudice.") (quoting *Duncan*, 256 F.3d at 201-02).

Here, Manso has not provided sworn statements specifying what the state witnesses or Salinas would have said. Accordingly, his failure-to-investigate claim fails. Even if sworn statements were not necessary to establish prejudice, Manso's claim would still fail because he has not established that, but for counsel's alleged failure to undertake the tasks of reviewing the statements and interviewing Salinas, the result would have been different. *See Manso*, 2015 WL 5038096, at *6 ("The State offered ample, if not overwhelming, proof of [Manso's] guilt."); *see*

11

*also Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *5 (D.N.J. May 2, 2016) ("The focus of the inquiry [of a failure-to-investigate claim] must be on what information would have been obtained . . . and whether such information, assuming admissibility in court, would have produced a different result."). Consequently, this claim provides no basis for habeas relief.

### 2.   Ineffective Assistance of Counsel by Failing to Call Character Witnesses

In Ground One's second sub-part, Manso argues trial counsel was ineffective for failing to investigate and call character witnesses. ECF No. 3 at 8. He names eleven individuals who, he asserts, "would have testified at trial as to [Manso's] good moral character and his kindness and lack of propensity toward violence." *Id*.  The PCR judge concluded that trial counsel's failure to call these witnesses "falls within the purview of 'strategic decision-making,'" explaining:

> [P]utting character in issue in a case of this nature would . . . be counterproductive and may result in the introduction of a defendant's prior criminal history.
>
> Having reviewed the proofs and testimony presented at trial, it can be said with a fair degree of certainty that character testimony would not "have changed the outcome of the trial." The State offered ample, if not overwhelming, proof of [Manso's] guilt. Accepting as true Manso's averment, counsel's decision not to call character witnesses on [his] behalf was a reasonable, strategic determination that cannot form the basis for an ineffective assistance of counsel claim.

*Manso*, 2015 WL 5038096, at *6 (alterations in original). The Appellate Division found no error in the PCR court's finding that even if counsel had investigated the character witnesses they would not have been called as a matter of trial strategy, explaining: "the proposed witnesses . . . knew Manso during the time he was convicted of drug possession in 1992 and 1995" and "their testimony could well have resulted in the prosecutor receiving permission to cross-examine them about their knowledge of Manso's prior convictions." *Id*. The court further found that, even if there was error, Manso did not demonstrate prejudice. *Id*.

This was not an unreasonable application of *Strickland*. *See Henderson*, 138 F. App'x at 469; *Diggs*, 833 F.2d at 446. The proposed witnesses' knowledge of Manso's previous convictions

12

could, as the state courts found, have left him open to cross examination about the witnesses' knowledge of those convictions, which would have defeated, or at least severely undermined, Manso's stated purpose of using these witnesses to establish his purported "good moral character." Because the witnesses' testimony was unlikely to help—and likely would have hurt—Manso's defense, counsel had a reasonable basis for not calling them. *See, e.g.*, *Curry*, No. 11-5800, 2015 WL 733274, at *13 n.19 (no ineffective assistance where "much of the purported testimony is character witness testimony" that "would have had minimal value for [petitioner]," and "opened the door to cross-examination about . . . [petitioner's] bad character"); *United States v. DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003) (trial counsel's decision not to call character witness due to concern prosecution would then attack defendant's character was "inherently tactical," "generally should not be disturbed," and not "objectively unreasonable" under *Strickland*). Under these circumstances, the Appellate Division's conclusion regarding trial counsel's tactical decision not to call certain witnesses was reasonable and did not violate *Strickland*.

Even if there was error, Manso has not established prejudice. In light of the discussion above, there is little reason to believe that had the character witnesses been called, the result would have been different. *See Strickland*, 466 U.S. at 694; *see also, e.g.*, *Curry*, No. 11-5800, 2015 WL 733274, at *13 n.19 ("In light of the mountains of evidence to the contrary, [character witness] would not have established [petitioner] was too busy being a good father to be a drug dealer."). Consequently, this claim provides no basis for habeas relief.

### 3.  Ineffective Assistance of Counsel by Failing to Call Manso as a Witness

In Ground One's third sub-part, Manso claims that (1) he informed trial counsel that he wanted to testify on his own behalf and (2) he was allegedly "never informed that it was his right to testify." *Id.* at 8–9. The Appellate Division set forth the relevant PCR testimony as follows:

> At the PCR hearing, Manso testified that he asked Sampson at some point during trial when he would testify. Sampson responded: "I'm not really sure if we're going to go that route, but we'll talk about that later." According to Manso, the promised conversation never took place. Manso further testified that he concluded it was up to Sampson to decide whether he would testify because Sampson never discussed it with him. However, the prosecutor cross-examined Manso with respect to his PCR certification, in which he asserted that Sampson "strenuously advised" him against testifying.

> Manso asserted that he would have denied any involvement in the crimes and any knowledge about them. Instead, he would have testified that he was not at the crime scene, "where the physical things were happening." Manso would also have denied being a Latin King regional officer, as well as any involvement with the Orange Crush. He was cross-examined about the more extensive involvement in the murders that he outlined in his certification. For example, he conceded on cross-examination that he had picked up some Latin King members and taken them to Romero's house and later drove Morante from Jersey City to Branch Brook Park[.]

> Manso acknowledged his prior drug convictions. He also acknowledged that Sampson had tried to impeach the credibility of the four witnesses (Martinez, Diaz, Luis Rodriguez, and DeJesus) who had testified against him at trial on the basis of their prior convictions.

*Manso*, 2015 WL 5038096, at *7–8.

The PCR court determined that (1) Manso was advised of his right to testify and (2) Manso had not demonstrated prejudice because he failed to show how the verdict would have been different had he testified. *Manso*, 2015 WL 5038096, at *8.

The *Strickland* standard applies "when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010) (quotations and citation omitted). The Appellate Division determined that there was sufficient support for the PCR court's conclusion that Samspon advised Manso of his right to

14

testify; namely, it was implicit in the hearing judge's opinion that the judge did not credit Manso's testimony that Manso and Sampson never discussed his right to testify. As the Appellate Division noted, Manso's certification stated that it was his "desire to testify at trial, but my attorney strenuously *advised* me against it." ECF No. 9-41 at 82 (emphasis added). This statement (1) supports the state court's finding that Manso and Sampson discussed the issue and Sampson "gave him *advice*"; and (2) "undercuts the credibility of [Manso's] testimonial assertions, especially his purported understanding that the decision was Sampson's rather than his own." *Manso*, 2015 WL 5038096, at *8 (emphasis in original). The Appellate Division's determination that Sampson did not render ineffective assistance by failing to advise Manso of his right to testify was not an unreasonable application of *Strickland*.

Even if Sampson failed to advise Manso of his right to testify, however, Manso has not established prejudice; the Appellate Division reasonably found that Manso's proposed testimony would not have changed the outcome. As the court found, Manso's proposed testimony "would have been counterproductive because it demonstrated his significant participation in the criminal event." *Manso*, 2015 WL 5038096, at *9; *see also* ECF No. 9-39 at 23 (Manso acknowledged at PCR hearing that "all four of the key witnesses of the state" testified that Manso was "calling the shots," "the boss on the scene," and "giving directions"); ECF No. 11 at 22–24 (Manso acknowledges in direct appeal brief testimony from State witnesses that Manso: "was giving the orders in the park"; told Luis Rodriguez "to break Omar Danny Morante's arm before killing him"; "said 'set it off' in Branch Brook Park" after which "Mikey Romero grabbed Omar D. Morante in a headlock" and Diaz "began to beat Cabrera with his hands and with a stick"). On this record, it was not unreasonable for the Appellate Division to reject Manso's argument that his proposed

testimony would have changed the outcome. Consequently, this claim provides no basis for habeas relief.

### 4.   Ineffective Assistance of Counsel by Being Intoxicated During the Trial

Manso alleges that trial counsel "appeared numerous times during trial to be intoxicated," "smelled of alcohol during trial," "was not paying attention during critical state witness testimony," and "appeared as though he did not know what was happening." ECF No. 3 at 9. The Appellate Division found "no credible evidence that Sampson was intoxicated during the trial," *State v. Manso*, No. A-2646-12T1, 2015 WL 5038096, at \*10 (N.J. Super. Ct. App. Div. Aug. 26, 2015), noting that "two trial attorneys who testified at the PCR hearing saw no signs of such intoxication." *Id.*

"[G]eneral allegations of alcohol use do not require a departure from *Strickland*'s two-prong standard." *United States v. Washington*, 869 F.3d 193, 204 (3d Cir. 2017) (footnote omitted). Alcohol or drug use by trial counsel "can certainly be relevant to both parts of an ineffectiveness inquiry, especially if amplified or systemic, or on close questions of strategy and jury perception." *Id.* But "alleged substance abuse is not, without more, one of the rare forms of dereliction amounting to the *per se* denial of a defendant's Sixth Amendment right to the effective assistance of counsel." *Id.*; *see also Frye v. Lee*, 235 F.3d 897, 907 (4th Cir. 2000) ("for an attorney's alcohol addiction to make his assistance constitutionally ineffective, there must be specific instances of deficient performance attributable to alcohol"); *see also Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) ("under *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim") (emphasis in original).

Manso's argument is based on the statements of his sister, Elissa Manso. But her testimony at the PCR hearing differed on this issue from the statements in her certification. In her certification, she did not mention counsel's alleged intoxication; rather, she was "present during a

large portion of the trial"; Sampson "often appeared as if he were not paying attention"; and "he would never listen to any advice that [she] provided." ECF No. 9-41 at 57. But in her PCR testimony, she alleged, for the first time, that Sampson appeared intoxicated. ECF No. 9-40 at 8–11.

In contrast, two of the trial attorneys testified at the PCR hearing that they saw no signs of intoxication. Counsel for Perez testified that he never saw Sampson intoxicated at any time, stating: "if that was the situation and we thought that there was something wrong, we would've brought it to the attention. [sic] That's not only going to have an adverse impact on his particular client, but . . . it's going to jeopardize the situation. I'm not putting up with somebody putting . . . my client into a position that it's going to get him screwed, I'm not going to do that. And if I had seen that, Mr. Hartiker, Mr. Feinberg, myself we would've done something to protect that from happening." ECF No. 9-38 at 54–56. Counsel for Luis Rodriguez testified that Sampson's appearance and demeanor during trial were not consistent with the claim that Sampson was intoxicated or had been drinking. ECF No 9-38 at 123. He further testified that he "would have brought that up if he had seen it." *Id.* at 124.

On this record, Manso has not rebutted the state courts' factual findings, which are entitled to deference. *See* 28 U.S.C. § 2254(e)(1). This Court will not revisit the state courts' decision to credit the trial attorneys over Manso's family member. *See Scott v. Sobina*, No. 09-1081, 2011 WL 6337566, at *8 (E.D. Pa. Dec. 16, 2011) (rejecting ineffectiveness claim where petitioner's claim that his counsel was intoxicated "throughout the trial" was supported with "biased" affidavits from family members). Accordingly, the Appellate Division's rejection of Manso's claim premised on Sampson's alleged intoxication was not an unreasonable application of *Strickland*.

Even if the Appellate Division had found that Sampson's performance fell below an objective standard of reasonableness, Manso has not established prejudice. He has not attributed any specific deficiency to his counsel's alleged alcohol use and, thus, has failed to demonstrate the outcome of his trial would have been different. This claim provides no basis for habeas relief.

### B.  Ground Two: Newly Discovered Evidence

In Ground Two, Manso alleges that there is newly discovered evidence that "the [S]tate coached witnesses, allowed witnesses to lie, gave plea deals to codefendants in exchange for their promise not to testify for defendant," "withheld information regarding the interview of [McKoyla Schupner,][9] a witness [who] may have proved helpful to [Manso]," and "provided incentives for Luis Rodriguez and Martinez[10] to testify against [Manso] by providing them access to their girlfriends and allowing them to engage in sexual intercourse while in custody in exchange for their testimony." ECF No. 3 at 12.

### 1.  Newly Discovered Evidence of Martinez's Recantation of Trial Testimony

Manso claims that he is entitled to a new trial based on the newly discovered evidence of Martinez's recantation of his trial testimony. As the Appellate Division noted, "[i]n stark contrast

---

[9] The records of the state court proceedings contain inconsistent spellings of Schupner's first name. Manso, the State, and the PCR hearing transcripts sometimes refer to her as McKolya or McKoyla (*see, e.g.*, ECF Nos. 9-40 at 80 and 30-1 at 8), and sometimes as Makalya (*see, e.g.*, ECF Nos. 9-38 at 137, 9-46 at 29, 9-47 at 46). The Court refers to her as "McKoyla," which is the spelling the PCR court used in its decision denying Manso's second PCR petition. ECF No. 30-1 at 8.

[10] At different points throughout his habeas filings, Manso refers to David Martinez as "Martinez" (ECF No. 3 at 8, 12 (habeas petition)), "Melendez" (*id.* at 12), and "Lonnie Melendez" (ECF No. 39 at 6 (Manso's reply to the State's answer)). Martinez testified at the PCR hearing that his full name is David Martinez and that "Lonnie Melendez" is an alias. ECF No. 9-38 at 131-32; *see also* ECF No. 30-2 at 28 (opinion denying first PCR petition explaining that David Martinez is "also known as Lonnie Melendez"); ECF No. 9-41 at 83 (Manso explaining in a certification to the PCR court that "Lonnie Melendez" is also known as "David Martinez"). This Court uses "Martinez" throughout this opinion, as did the state courts.

to his trial testimony, Martinez testified at the PCR hearing that Manso had no involvement in the crimes against Morante and Cabrera." *Manso*, 2015 WL 5038096, at *10. The Appellate Division summarized the relevant PCR testimony as follows:

> [Martinez] explained that some Essex County assistant prosecutors and Detective Ruben Contreras encouraged him to testify falsely "throughout the whole process" in exchange for a lenient sentence. Martinez claimed he was allowed to "read papers that he wasn't supposed to read . . . to collaborate [sic] other witness statements" and was told "what to say and how to say it." He was also instructed to "put his own twist to it . . . in his own words."
>
> Martinez further testified that Contreras promised him that he and his girlfriend could engage in sexual activity in the Prosecutor's Office if he testified as instructed. He asserted that they were left alone in an office for an hour after he testified, during which he and his girlfriend engaged in sexual activity.
>
> On cross-examination, Martinez acknowledged his use of seven aliases because he "was trying to get away from the warrant check" on seven different occasions. He also admitted to writing a letter to someone, whose identity he could not recall, seeking $1000 in exchange for an affidavit that exculpated Manso. In addition, Martinez confirmed that he had six prior felony convictions, which included burglary, conspiracy to commit murder, and drug possession.
>
> Contreras testified at the hearing and denied that he or anyone else connected with the Prosecutor's Office had coached Martinez to lie. He also denied that Martinez was left alone with his girlfriend so he could engage in sexual relations with her.

*Id.* (brackets omitted). The PCR judge found that "a recantation by Martinez could be characterized as newly discovered evidence." *Id.* However, the judge concluded that "Martinez's testimony was 'simply false and bereft of credibility.'" *Id.* The Appellate Division found this conclusion was "well supported in the record" and there was "no error or abuse of discretion in the judge's rejection of Manso's claim that a new trial was warranted." *Id.* The court further found that Manso's argument that "the State relied on two perjured witnesses, Martinez and Luis Rodriguez," was meritless because "Manso failed to demonstrate that their testimony was perjured or that any perjury was induced by the State." *Id.*

"It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). In this case, the state courts did not rely on federal law; rather, they applied the relevant state law standard for granting a new trial based on recanted testimony. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) (Claims "based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. . . .This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.").

Under state law, Manso had to establish that Martinez's testimony at the PCR hearing was "probably true and the trial testimony probably false." *State v. Carter*, 354 A.2d 627, 631 (N.J. 1976). The state courts' determination that Manso failed to carry his burden is not a basis for federal habeas relief. *See Herrera*, 506 U.S. at 400–405 ("Petitioner in this case is simply not entitled to habeas relief. . . . For he does not seek excusal of a procedural error so that he may bring an independent constitutional claim challenging his conviction or sentence, but rather argues that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect."); *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (Petitioner's claim was "not cognizable under the federal habeas statute because it rests on state, rather than federal, law. It has long been recognized that claims of actual innocence based on newly discovered evidence are never grounds for federal habeas relief absent an independent constitutional violation.").

Even if the Court were to consider the merits of Manso's arguments, it would conclude that the state courts' determination that Martinez lacked credibility for numerous reasons—including

because he at some point apparently sought $1,000 in exchange for an affidavit that exculpated Manso, ECF No. 9-41 at 45; ECF No. 9-38 at 152–153, 161, 164; and because he had six prior felony convictions and had used seven aliases to avoid warrant checks, *id.* at 162–163—was well supported. *See Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988) ("Courts have historically viewed recantation testimony with great suspicion."). Further, Martinez's purported recantation is not the sort of evidence meriting a new trial, because it was inherently suspect and there was strong evidence of Manso's guilt. Given that factual findings at the State level should be presumed correct, *see Weeks,* 219 F.3d at 258, Manso has not established that he is in custody in violation of the Constitution, federal laws, or treaties of the United States, and the Appellate Division's holding does not provide grounds for habeas relief.

### 2. Newly Discovered Evidence that the State Withheld Information Regarding Schupner

Manso claims that the State failed to disclose a potentially favorable witness (Schupner). The Appellate Division set forth the relevant findings of the second PCR court as follows:

> [The judge] identified [Manso's] contention as being that the State "deliberately withheld the interview and statements of a witness," specifically, [Schupner], the girlfriend of [Martinez], who was the State's "chief confidential informant." [Manso] supported his contention by stating [Schupner] "was on the run with [Martinez] for approx[imately] one (1) year while he was hiding from authorities and would have been privy to conversations about the incident" that gave rise to [Manso's] conviction. The judge concluded that this argument was "replete with speculation" because the record did not confirm that [Schupner] "was in fact interviewed."
>
> The judge reviewed in detail portions of the record that established there was no confirmation of any interview and in fact no support from [Martinez] that [Schupner] "had any conversations with [Martinez] about the events or was ever interviewed by the [S]tate regarding this matter." The judge concluded that [Manso's] version of the events was based upon pure speculation and he failed to establish a substantial denial of justice.

*Manso*, 2020 WL 1809794, at *1–2.

The Appellate Division was not persuaded by Manso's arguments and affirmed the PCR court's findings "substantially for the reasons expressed by [the second PCR judge] in her written decision." It further stated that Manso "failed to establish a viable claim that the prosecution in his case failed to disclose to defendants any exculpatory evidence or evidence that was material to his conviction." *Id.* at *2 (citations omitted).

"[T]he suppression of evidence favorable to an accused . . . violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 432–33 (1995) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Suppressed evidence is "material" if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation omitted). A petitioner seeking to establish a *Brady* claim must therefore show that evidence was suppressed, the evidence was favorable to the defense, and the evidence was material. *United States v. Risha*, 445 F.3d 398, 303 (3d Cir. 2006).

Manso fails to state an underlying *Brady* violation, let alone that the Appellate Division's rejection of his argument was either contrary to or an unreasonable application of *Brady*, its progeny, or other clearly established federal law. Likewise, the Appellate Division's determination was not an unreasonable application of the facts. As the Appellate Division noted, the PCR judge reviewed the record of the first PCR hearing and found no support that [Schupner] "had any conversations with [Martinez] about the events or was ever interviewed by the [S]tate regarding this matter." *Manso*, 2020 WL 1809794, at *2. The second PCR judge could not find "with any certainty that Ms. Schupner was in fact interviewed." ECF No. 30-1 at 8 ("The entirety of the PCR transcript regarding this matter consists of [Investigator Ruben] Contreras being unable to recall any specific details, and speculating as to what may have happened if in fact the Defense's theory

of events was correct. To the point wherein the court had to instruct Mr. Contreras multiple times not to assume an answer . . . ."); *see also* ECF No. 9-40 at 80–100. On this record, Manso has failed to establish a *Brady* violation. Indeed, he has failed to establish the existence of any suppressed evidence. Consequently, this claim provides no basis for habeas relief.

### 3. Newly Discovered Evidence that Codefendant Was Told Not to Testify

The Appellate Division summarized the second PCR court's analysis and findings as to Manso's claim that his codefendant was told not to testify as follows:

> [T]he judge found that "this same issue was examined by the PCR court as to [another] codefendant." The judge considered the issue, even though it was not raised by [Manso] in his supporting brief, because it was raised by the federal court as an issue to be addressed. The judge found that [Manso's] contention about his codefendant being told not to testify was based upon his incorrect reading of the codefendant's plea agreement. The judge noted that the first PCR court already resolved the issue by finding that the statement in the codefendant's plea agreement was simply that "the [S]tate would not compel the codefendant to testify or use their statement against the codefendant at trial." That argument, which was addressed by the first PCR court, applied to [Manso's] present contention as well.

*Manso*, 2020 WL 1809794, at *2.

Manso's claim—that he is entitled to a new trial because of newly discovered evidence that the State gave plea deals to codefendants in exchange for their promise not to testify on his behalf—does not merit habeas relief. Under relevant state law for this claim, Manso "must show that the evidence is 1) material, and not merely cumulative, impeaching, or contradictory; 2) that the evidence was discovered after completion of the trial and was not discoverable by reasonable diligence beforehand; and 3) that the evidence would probably change the jury's verdict if a new trial were granted." *State v. Ways*, 850 A.2d 440, 449 (N.J. 2004) (citation and quotation omitted).

Manso has failed to establish the existence of the "newly discovered evidence" he alleges; as the second PCR court found, Manso misreads the "no testimony" language upon which his argument relies. Brian McGovern, Rajabzadeh's counsel, testified at the PCR hearing that he wrote

"no testimony" on his client's plea form. ECF No. 9-40 (PCR hearing transcript) at 36–38. Asked to explain what "no testimony" meant, McGovern stated: "The defendant Sfand Rajabzadeh did not want to go to trial. He wanted me to get the best deal for him without requiring him to testify for the State and this form fairly depicts what I was charged with him to do." *Id.* at 38. McGovern agreed that his client was not precluded "by the Prosecutor or the State from coming in and testifying against any of his co-defendants in this case," *id.* at 38–39, and further agreed that "It wasn't part of the plea bargain by the State that they were foreclosing him from testifying on behalf of his co-defendants." *Id.* at 50; *see also* ECF No. 30-1 at 9. In other words, Manso's codefendants were not, in fact, prohibited from testifying on his behalf. On these facts, Manso has not established that the state court's holding is contrary to clearly established federal law, and he is not entitled to habeas relief. *See Herrera*, 506 U.S. at 400–05; *Fielder*, 379 F.3d at 122.

### C. Ground Three: Jury Charge on Cooperating Witness Testimony

In Ground Three, Manso alleges that "the [trial] court did not adequately or in any way explain to the jury how it should assess the testimony of witnesses that received favorable plea agreements by the [S]tate in exchange for testimony against [him]." ECF No. 3 at 14.

In its opinion on Manso's direct appeal, the Appellate Division provided the language of the model jury charge for testimony of a cooperating codefendant or witness involved in the crimes. ECF No. 9-43 at 60 (quoting Model Jury Charges (Criminal), Accomplice Testimony (revised 1/25/99)). The Appellate Division found that the trial court administered the model charge and, "[m]oreover, led up to th[e] charge with ample additional cautions . . . ." ECF No. 9-43 at 60. The Appellate Division rejected Manso's argument that the instructions were not sufficiently fact sensitive and found there was no error regarding the charge:

The judge did make specific references to Martinez, Diaz, DeJesus, and [Angel] Tirado. There is no requirement for a judge to be more specific than this concerning the issue of the credibility of accomplices.

In addition, here there was no danger that the jury failed to get the message that the accomplice testimony was inherently suspect. Defense counsel made this the theme of cross-examination and summation. [Manso's] counsel argued in summation:

> I suggest to you ladies and gentlemen that, as you review in your own mind the witnesses that the State has presented to you, you can't possibly believe that those young men are credible. They brought to you a rogues gallery of liars, drug dealers, thieves, wife beaters, and murderers. That's who these young men were who came in and testified to you.

He then pointed out that most of the State's witnesses had sought lenient treatment in exchange for their cooperation, and urged that they be disbelieved. No error occurred in this regard.

ECF No. 9-44 at 3.

"Questions related to jury charges are normally matters of state law and are not cognizable in federal habeas review." *Paulino v. Ortiz*, No. 03–4463, 2005 WL 2922369, at *4 (D.N.J. Nov. 4, 2005); *see also Estelle*, 502 U.S. at 71–72 ("the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief"). "A habeas claim will lie only where the jury instruction is so prejudicial as to amount to a violation of due process and fundamental fairness." *Freeman v. Davis*, No. 18-8269, 2021 WL 4705009, at *8 (D.N.J. Oct. 7, 2021) (quotations omitted). "[A] habeas petitioner must demonstrate both (1) that the instruction contained some ambiguity, inconsistency, or deficiency, and (2) that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (quotations and citations omitted). "An omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Manso has not made the requisite showing for habeas relief. First, he has not demonstrated that the instruction contained an ambiguity, inconsistency, or deficiency. ECF No. 3 at 14. As the Appellate Division found, the trial court's charge was consistent with the model jury charge and state law. ECF No. 9-43 at 60. Manso argues that the trial court did not explain to the jury "how it should assess the testimony of witnesses that received favorable plea agreements." ECF No. 3 at 14.  But the trial judge did refer to Martinez, Diaz, DeJesus, and Tirado while charging the jury about cooperating witnesses. ECF No. 9-33 at 43 (explaining that cooperators "pleaded guilty and were given plea bargains or some exposure to lesser offenses and lesser terms of imprisonment than they would have otherwise faced had they gone to trial," and specified the offenses for which certain witnesses were not prosecuted).   And, as the Appellate Division found, "there is no requirement for a judge to be more specific than this concerning the issue of the credibility of accomplices." ECF No. 9-44 at 3; *see also Freeman v. Davis*, No. 2:18-CV-8269 (BRM), 2021 WL 4705009, at *9 (D.N.J. Oct. 7, 2021) ("Petitioner is arguing here that the jury instruction on causation should have been tailored to Petitioner's version of facts of the case . . . . However, that is a State law claim and not a basis for habeas relief."); *Boretsky v. Ricci*, No. 09-0771, 2012 WL 664945, at *24 (D.N.J. Feb. 29, 2012) ("To the extent that [petitioner] contends that the instructions were unconstitutional because the judge did not specifically relate the law to the facts of the case, the claim fails because Supreme Court precedent does not require the instructions to relate the law to the facts.") (citation omitted).

Second, Manso has not demonstrated that the jury likely applied the instruction in a way that relieved the State of its burden of proving every element beyond a reasonable doubt. To the contrary, the judge advised the jury, among other things, that (1) "whether [witnesses] testified having received a plea bargain, whether they testified and were not charged with offenses, is an

issue that you may evaluate in deciding their credibility"; (2) "[y]ou may consider the extent, if any, of a witness's involvement, whether he has an interest in the case, and whether his testimony is influenced by the hope of favorable treatment"; and (3) "if you find that a witness has some criminal involvement, you should carefully scrutinize all the witnesses' testimony to see if it has been corroborated by other witnesses' testimony, and if you do not find any other credible corroborating testimony, you may disregard the testimony of a witness if you find it proper to do so." ECF No. 9-43 at 60; ECF No. 9-44 at 2. Further, as the Appellate Division found, "there was no danger that the jury failed to get the message that the accomplice testimony was inherently suspect. Defense counsel made this the theme of cross-examination and summation." ECF No. 9-44 at 3.

On this record, the Appellate Division's ruling was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, this claim provides no basis for relief.

**Ground Four: Prosecutorial Misconduct**

In Ground Four, Manso alleges that the State "manufactured conspiracy charges related to the kidnapping by investigators falsely asserting facts they knew [were] incorrect"; "the false information was used to obtain an indictment"; "at trial the [S]tate used and suborned perjured testimony of Luis Rodriguez by using information that was fabricated and provided to Luis Rodriguez by investigators"; and, in his summation, the prosecutor "misstated testimony, mischaracterized the evidence, referenced facts not in the record, improperly vouched for witness credibility, commented on [Manso's] silence," "cast aspersions on defense counsel," "and asked the jury to return a verdict on passion[,] not the facts." ECF No. 3 at 17.

At the outset, Manso's allegation that the prosecutor "asked the jury to return a verdict on passion[,] not the facts" is contradicted by the record. ECF No. 3 at 17. The Court reviewed the

27

prosecutor's summation and found no evidence to support Manso's allegation. Accordingly, Manso's claim for prosecutorial misconduct on this basis fails. ECF No. 9-32 at 15–52.

### 1. Investigator Misconduct

The Appellate Division found Manso's claim premised on investigator misconduct was meritless; the assertion that defendants had participated in a conspiracy to commit kidnapping— which was made in the July 24, 1998, affidavit of Investigator Patrick DeFrancisci that was submitted in support of the arrest, search, and seizure of various defendants—was "well supported by the evidence that had been collected." ECF No. 9-44 at 10.

Manso's argument that the State "manufactured conspiracy charges" and used "false information" to obtain an indictment does not provide a basis to grant him federal habeas relief. There is no federal right to indictment by a grand jury in state criminal prosecutions. *See Rose v. Mitchell*, 443 U.S. 545, 557 n.7 (1979). Therefore, absent an allegation of an independent federal constitutional violation, a state grand jury claim is not cognizable. *See Smith v. Lamas*, No. 12-4681, 2014 WL 1673234, at *16 (E.D. Pa. Apr. 28, 2014) ("habeas claims premised on perceived deficiencies in state grand jury proceedings are not cognizable on federal habeas review"). And assuming Manso's allegations were true, "the petit jury's guilty verdict rendered any prosecutorial misconduct before the indicting grand jury harmless." *United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993) (citation omitted); *see also United States v. Mechanik*, 475 U.S. 66, 70 (1986) ("the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a

reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.").

As Manso's allegations do not constitute a cognizable claim, he has not established that he is in custody in violation of the Constitution, federal laws, or treaties of the United States. *See Downer v. Warren*, No. 11-6414, 2013 WL 1986395, at *19 (D.N.J. May 13, 2013) ("Petitioner's challenge to *any* aspect of his grand jury proceedings cannot raise a question of federal law: it would be subject to dismissal as not cognizable in habeas review.") (emphasis in original; citations omitted). Accordingly, Manso's claim that there was prosecutorial misconduct in securing an indictment does not present a proper basis for habeas relief.

## 2. False Trial Testimony

The Appellate Division rejected Manso's claim regarding allegedly false trial testimony, finding that any inconsistencies in trial testimony "provide a basis for a weight of the evidence argument, but do not support a claim of prosecutorial misconduct." ECF No. 9-44 at 12.

The prosecution's knowing use of perjured testimony violates the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "Perjury is the willful, knowing and corrupt giving, under oath, of false testimony material to the issue or point of inquiry." *United States v. Rose*, 215 F.2d 617, 622–23 (3d Cir. 1954). When false testimony is presented, a conviction must be vacated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Biberfeld*, 957 F.2d 98, 102 (3d Cir. 1992). Thus, a habeas petitioner must "show that (1) [the witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004).

Manso has not demonstrated evidence of prosecutorial misconduct, let alone misconduct of a constitutional dimension; the record simply does not support his contention that there was perjured testimony. To the extent Manso relies on Martinez's PCR hearing testimony to support his claim that the State "[used] information that was fabricated," that testimony has already been determined to be incredible and thus cannot serve as a basis for the instant claim.

To the extent Manso relies on inconsistencies in Rodriguez's trial testimony, this too is insufficient. *See Lambert*, 387 F.3d at 249 ("There are many reasons testimony may be inconsistent; perjury is only one possible reason."); *United States v. Mershon*, No. 10-1861, 2010 WL 4104665, at *8 (E.D. Pa. Oct. 19, 2010) ("The mere presence of inconsistent statements . . . does not establish that the prosecutor willfully presented perjured testimony."); *see also United States v. Wolny*, 133 F.3d 758, 763 (10th Cir. 1998) (explaining that "[c]ontradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony").

Moreover, Manso has not demonstrated that the state court's determination of the facts was unreasonable. Accordingly, he has not shown that the Appellate Division's disposition of this claim was contrary to, or was an unreasonable application of, Supreme Court precedent. Therefore, his prosecutorial misconduct claim based on alleged perjured testimony fails.

### 3.  Improper Summation Comments

#### a.  Criticism of Defense Counsel and Courage Comments

In addressing Manso's claims regarding alleged prosecutorial misconduct in summation, the Appellate Division noted that "much of Manso's argument repeats the claims addressed earlier in this opinion when we decided *Romero*." ECF No. 9-44 at 12 (citation omitted). Romero's claims were, inter alia, "that he was denied his Sixth Amendment right to due process and his Fifth

Amendment right to remain silent because the prosecutor demeaned defense counsel," and "urged the jury to have the courage to convict." ECF No. 9-43 at 27. The court found that any improper comments "were isolated and rendered harmless by curative instructions." *Id.* at 27–28.

The Appellate Division described the criticism of defense counsel and courage comments, the context in which the comments were made, and the trial judge's findings as follows:

> Defendant contends that the prosecutor unfairly criticized defense counsel. The prosecutor referred to the claim by defendant's counsel in his summation that an investigator had coached Martinez to implicate defendant Byrd by repeatedly referring to his chin and stroking it (an allusion to Byrd's nickname). The prosecutor correctly pointed out that there was no evidence to support that theory, adding:
>
>> His job is to challenge, challenge the State's evidence. His job is to get his client off, but when he makes up something like that, if somebody starts, in that jury room, to say what about the part— somebody has got to say, time out, time out that's a statement of a defense attorney. He's not doing anything wrong. He's legally entitled to do that, but that's not your tools . . . Your tools are the evidence in the case.
>
> Defendant also contends that the prosecutor unfairly commented on the "courage and commitment to human life" showed by DeJesus when he took the witness stand. The prosecutor added, "it's a courage you'll have to show, you'll all have to show at some point." . . .
>
> . . .
>
> The judge agreed that the comment that defense counsel's job was to get his client off was improper, but found that, in context, it was not so egregious as to deprive any defendant of a fair trial. . . . It is well accepted that a prosecutor's mischaracterization of the role of defense counsel exceeds the bounds of bare comment. However, when the dereliction is both isolated and fleeting, as it was there, forceful jury instruction can obviate the potential for prejudice.
>
> The judge found that there was no overreaching in the comment that it required courage for DeJesus to confront defendants and tell his story in court, because DeJesus saw at first hand what happened to the victims and would naturally fear retribution. She had not even taken note of the further comment concerning the courage the jury would have to show in the future, which suggested to her that it was benign. She found it was easily subject to the interpretation claimed by the prosecutor, which was that it referred to courage needed generally in life, and did not exhort the jury to have the courage to return a guilty verdict. The judge

concluded that, because the comment was subject to more than one interpretation, she would have preferred it had not been made, but believed that it was not so egregious as to lead to a deprivation of the right to a fair trial, either by itself or in combination with other statements.

Our courts have disapproved comments by prosecutors implying that the jurors would be guilty of cowardice if they voted to acquit. Here, however, the jury was not exhorted to have the courage to convict, and the judge found that implication was not intended. Nevertheless, to avoid an improper inference, she instructed the jury to disregard the statement.

ECF No. 9-43 at 29–32 (citations omitted).

As to the prosecutor's comment that defense counsel's job is to "get his client off," the trial judge instructed the jury to disregard the comment:

Now, again, during the prosecutor's summation, he commented that it is a defense attorney's job to challenge the State's evidence. That is accurate.

The prosecutor also commented it is also a defense attorney's job to get his client off. This is not accurate and should not be considered by the jury. It is not the job of defense counsel to get their clients off. In other words, this remark was improper, it represents a misstatement of the defense attorney's position in the trial of a criminal case. Pursuit of an acquittal or verdict of not guilty is not the sole area in which a defense attorney operates. His duty is to see to it that the lawful rights and privileges of an accused are not invaded and that he is not convicted except on legal evidence and by due process of law. This is the role of defense counsel.

The jury is, therefore, advised they are to disregard that comment by the prosecutor. It was an improper comment, and it should play no role in your deliberations.

*Id.* at 32 (brackets omitted).

As to the prosecutor's comment regarding the jury's need to show courage, the trial judge responded with an explanation of the role of the juror and the function of the jury:

I need to bring to your attention a comment that was made during the summations of counsel, particularly—specifically, I should say the prosecutor's comment.

At some point he made a comment to you in the context of talking about the courage of one of these witnesses to come into this courtroom and testify, he made the following comment "It's a courage you'll have to show, you'll all have to show at some point."

32

Now, that statement is subject to more than one interpretation. Let me say this to this jury in terms of what your role is. Being a juror involves a sacrifice. That's one of the things that I said to you at the beginning of the case when you were selected. It is probably one of the most important functions you will perform in your lives as private citizens.

It is not a question of courage, it is a question of fairness, without passion, prejudice or sympathy, and of course, the decisions that you make in this case must be based upon evidence, and they must be based upon law.

This is the function of the jury, this is the way that the jury is to go about its business. Courage has nothing to do with that. You are to disregard the comment made by counsel during his summation, and it should play no part in your deliberations.

*Id.* at 32–33.

The Appellate Division rejected Romero's contentions that, inter alia, no curative instruction would have been sufficient and the instructions were too remote in time from the offending comments. *Id.* at 33–34. The court found that the trial court's instructions "were detailed and complete, and the primary jury charge in which they were included was an appropriate time to address comments made in summation." *Id.* at 34. The Appellate Division reiterated this holding in addressing Manso's identical prosecutorial misconduct claims:

Defendant argues that in summation the prosecutor unfairly characterized defense counsel and improperly appealed to this jury to show courage. We are satisfied that any improprieties were cured by jury instructions. This issue is discussed earlier in this opinion where we concluded that none of the prosecutor's comments in summation that defendants complained of warranted reversal. *See Romera*, *supra*.

ECF No. 9-43 at 56–57.

When a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted). In evaluating the likely effect of improper comments, a court may consider whether they were invited by or responsive to prior comments by opposing

counsel. *Darden,* 477 U.S. at 181–82. Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Upon review of the prosecutor's entire summation and in light of the trial evidence, the Court finds the criticism of defense counsel and courage comments were not so prejudicial as to deny Manso of due process. The Appellate Division reasonably applied the correct due process analysis and found the curative instructions sufficient to mitigate any prejudicial effect.

As to the prosecutor's comment that it is "a defense attorney's job to get his client off," in addition to correctly explaining the role of a defense attorney, the trial court was clear in its instruction to the jury to "disregard that comment by the prosecutor." ECF No. 9–43 at 32.  The court told the jury that the comment (1) "is not accurate and should not be considered by the jury"; (2) "was improper"; (3) "represents a misstatement of the defense attorney's position in the trial of a criminal case"; and (4) "should play no role in your deliberations." *Id.*

As to the prosecutor's comment regarding courage, the trial court also clearly instructed the jury that the comment "should play no part in your deliberations." *Id.* at 33. The court stated that being a juror "is not a question of courage, it is a question of fairness, without passion, prejudice or sympathy," and "the decisions that you make in this case must be based upon evidence, and they must be based upon law." *Id*. These instructions, recited in full above, support the state court's conclusion that any potential prejudicial effect was mitigated. *See Console*, 13 F.3d at 673 ("We conclude that although the prosecutor's conduct may have been questionable at times, any misconduct was harmless in the context of the trial as a whole. This is particularly true due to the curative instructions given to the jury by the district court.").

Accordingly, the Appellate Division's rejection of this claim was not contrary to, or an unreasonable application of Supreme Court precedent. Therefore, Manso's prosecutorial misconduct claim provides no basis for habeas relief.

### b. Justice for the Victims Comment

The Appellate Division also considered Manso's argument that the prosecutor made an improper comment regarding justice for the victims. The prosecutor stated, in relevant part:

> We cannot give those victims and their families justice. We can't do that. Only you can do that.

> Other times in your life when you heard the word "justice," you were a spectator. Today justice is in your hands. People who care for justice, the people who cared for the victims look to you for justice.

> I submit to you the only just verdict is guilty, and if you find them guilty, we will all walk from this courtroom with our head held high.

ECF No. 9-43 at 57.

The Appellate Division conducted the following analysis in determining that the prosecutor's comments did not provide a basis for reversal:

> It is improper for a prosecutor to encourage a jury to convict based on a societal duty. However, unlike cases where a prosecutor told the jury that its duty was to protect society from crime, or to send a message to the community, here the prosecutor said that the jury's duty was to do justice. However, the follow-up comment that a guilty verdict was the only just verdict was improper because it suggested that the prosecutor personally believed in defendants' guilt. It is improper for the prosecutor to express his personal belief as to the truth or falsity of any testimony of the defendant. The problem with such an expression of opinion is the danger of improper diversion of the jury's attention from the facts of the case.

> Prosecutorial misconduct requires reversal only if it was so egregious that it deprived the defendant of a fair trial. These comments, though improper, were made at the end of a long and detailed summation that did focus on the facts of the case. Moreover, none of the five defense counsel[] objected to these remarks below. They apparently did not find these comments worthy of objection, although all joined in a motion for mistrial based on several other comments made in summation. Generally, remarks are not deemed prejudicial where no objection was made, because that indicates that the defendant did not find the remarks prejudicial in

context. Moreover, the failure to object deprives the judge of an opportunity to take curative action. The comments here do not warrant reversal.

ECF No. 9-43 at 57–59 (quotations and citation omitted).

The Court finds the justice for the victims comment did not rise to the level of a constitutional violation. It was not so prejudicial as to render the trial unfair or deny Manso due process. *See Darden*, 477 U.S. at 179. The Appellate Division reasonably applied the correct due process analysis in finding that the comments did not warrant reversal because (1) the remarks were "made at the end of a long and detailed summation that did focus on the facts of the case," and (2) defense counsels' failure to object indicated that they "apparently did not find these comments worthy of objection." ECF No. 9-43 at 58. This was not contrary to or an unreasonable application of Supreme Court precedent.   Therefore, Manso's prosecutorial misconduct claim based on the justice for the victims comment provides no basis for habeas relief.

### c.   Failure to Testify Comment

The Appellate Division addressed Manso's argument that the prosecutor improperly commented on Manso's failure to testify as follows:

> The prosecutor said, "I understand why nobody wanted to come to the box." The absence of any objection below suggests that defendant did not believe the remark was prejudicial in context. Moreover, it appears from the context that this was a comment on the reluctance of many Latin Kings to testify, not necessarily defendants. . . .

ECF No. 9-44 at 12–13 (citation omitted; brackets in original). The Appellate Division also noted that "[t]he larger context was the State's response to the defense position that all the State's witnesses were liars, a position that defense attorneys had introduced in their openings." *Id.* at 13.

A defendant's Fifth Amendment right to be free from self-incrimination has been violated where "the language was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Brennan*, 326 F.3d 176,

187 (3d Cir. 2003) (internal quotation omitted). "Statements regarding the absence of facts in the record, however, need not be taken as comment on a defendant's failure to testify." *Id.* (brackets, quotations and citation omitted). "Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence," a defendant's privilege against compulsory self-incrimination is violated. *United States v. Robinson*, 485 U.S. 25, 32 (1988).

The following passage from the prosecutor's summation encompasses the prosecutor's comment about "why nobody wanted to come to the box." The prosecutor is describing evidence found in connection with the drive-by shooting that triggered the kidnappings and murders:

> There were 38 witnesses who put together different pieces of the equation. Now, the Defense version is everyone's a liar. I'm kind of in a thing where I have to review some of the evidence, but I'll review it for an eye of corroboration, for an eye of saying this evidence proves what the witnesses told you was the truth.
>
> . . .
>
> . . . If you do a driveby shooting, you're on the street . . . Where are the bullets found? Shots found by the steps of the house. Juan DeJesus—Michael Romero said him and his boy came out and shot back at them. Where does the policeman say the bullets are found? Coming out of the house not on Wayne Street, but on Brunswick.
>
> Spanky said another thing. How he gets all this is beyond me. He said I told him I'll be his lawyer if they have a trial about this shootout because there's no bullets in the cars, there's no bullets in the houses. What did Officer Rivera tell us? There's no bullets in the cars, there's no bullets in the houses. Spanky is corroborated by Officer Rivera. He doesn't know this guy, he's never had dealings with him. Spanky told you something on the 10th, it's corroborated by the police officer.
>
> What else is corroborated by the evidence? I understand why nobody wanted to come to the box. He said two people were shooting. If two people are shooting, how many kinds of bullets would you expect to have?
>
> (Putting out evidence on rail.)
>
> Two different kinds of bullets. Two different kinds of bullets. Does that corroborate? Is that evidence that shows what they said was the truth? Gold bullets and silver bullets. Two different kinds of bullets.

> I understand everybody's a liar, everybody's a liar. They called them liars before they even walked in the courtroom, didn't even know what they were going to say, yet everyone's a liar.

ECF No. 9-32 at 21–22.

The Appellate Division found that, taken in context, the prosecutor may have been commenting on the reluctance of many Latin Kings to testify and not necessarily the defendants' reluctance to testify. Even in context, it is unclear whether the prosecutor was referring to the defendants; rather, it appears that the main point was to connect corroborating evidence to the cooperators' testimony to rebut the defense's characterization of the State's witnesses as liars. Either way, as the state court reasonably found, the "absence of any objection below suggests that defendant did not believe the remark was prejudicial in context." ECF No. 9-44 at 12–13.

Even if the remark were intended to refer to the defendants' failure to testify, however, considered in the context of the entire trial, it was not so prejudicial as to render the trial unfair. *See Darden*, 477 U.S. at 179; *cf. United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) ("isolated comment" by prosecutor that defense did not object to did not result in "miscarriage of justice" when "viewed in the context of the entire summation"); *Werts*, 228 F.3d at 198 ("In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, we are required to examine those remarks in the context of the whole trial."). As stated throughout this opinion, there was strong evidence of Manso's guilt. Thus, the Appellate Division's finding that the comment did not warrant reversal was not an unreasonable application of Supreme Court precedent. Therefore, Manso's prosecutorial misconduct claim based on the alleged failure to testify comment does not merit habeas relief.

### D. Ground 5: Jury Misconduct

In Ground Five, Manso contends that the jury engaged in misconduct when certain jury members had outside contact with trial spectators. ECF No. 3 at 19. Manso argues that the judge

should have questioned the entire panel about the alleged improper contact. *Id*. In rejecting this claim, the Appellate Division relied on its analysis earlier in the decision addressing the same claim by Romero. There, the court described the incidents at issue as follows:

> On February 18, 2001, the judge announced that three jurors had told the sheriff's officer that someone from the audience had attempted to speak to them. She determined that she must question these jurors. Juror fourteen reported that when she and juror eleven were leaving the courthouse on the day before, someone who had been in the courtroom audience walked up behind them and asked, "What do you think?" She did not respond, and no more was said. Juror fourteen believed that this incident did not prevent her from remaining fair and impartial, since there was no more than a question asked. Juror eleven confirmed that account, though she said she had responded, "I don't know nothing." She, too, believed the mere attempt to talk to her would not prevent her from being a fair juror. Juror thirteen was also questioned. He said that no one had attempted to speak to him about the case. He explained:
>
>> What happened, on Monday, I was followed by these four people. I walked across the street; they walked across the street. I went back across the street; they went back across the street. They kind of laughed and joked as [if] to intimidate me. That's what the intention was. I was alone.
>>
>> So when I—when the jurors brought up the incident, I said, well, you know what, maybe we should be allowed, in here, to be a little more secure or something, only because I know that there was a tactic that was executed upon me when I was alone, and so that we probably should not be alone, at least as I did, walking the street.
>>
>> I was actually just going down to see if I could get a salad at McDonald's. That occurred, made me realize I didn't want to leave the building.
>
> He stated that he didn't find the incident significant until another juror said she had been approached, but on hearing that, believed that more security would be desirable. The people who followed him did not say anything, but, through body language, let him know that they knew who he was. He recognized them as people who had been in the courtroom that morning, but said they had not been back since.
>
> Juror thirteen said he was afraid at the time, and thought it was a scare tactic, to let him know he was in danger. He added, "Let's put it this way, I don't like being out in that hall when we're waiting. I don't like being out in that hall." He was not sure if he felt he was in danger, but was "uncomfortable." But he vehemently denied that he had a level of discomfort that would prevent his being a fair and impartial juror in this trial. When asked that question, he said, "Oh, no, not at all. No. What's

going on with the trial and what people are sitting here are two different things, and the people that are sitting here, I don't know who they are, what their allegiance is. I know nothing at all."

The judge asked again, "Do you feel you can be a fair and impartial juror?" The juror answered, "Absolutely." The judge asked, "You feel we should take some additional measures?" He answered, "That's the only thing I think." All three jurors were told not to discuss this with the other jurors.

. . .

. . . The judge then instructed the entire jury concerning the way to treat approaches by outsiders. She also instituted additional measures for keeping the jurors away from spectators, isolating them before and after the court day and at lunch.

ECF No. 9-43 at 22–25 (alteration in original).

In concluding that the judge acted within her discretion and correctly found no reason to dismiss any juror, the Appellate Division stated:

Although juror thirteen said he felt intimidated by the laughing people who seemed to follow him across the street, he made clear that the incident had no capacity to influence him. No words were spoken and there was no indication that the people were trying to influence him. The judge had the opportunity to observe this juror's demeanor.

Defendant [Romero] speculates that the juror was influenced by fear to find him guilty on all accounts. However influence cannot be inferred merely because that was the verdict. As juror thirteen made clear, he did not get any message which way the outsiders might have wanted to influence him, if at all, or, as he said, what their "allegiance was." The incident was without content, and was related to the trial judge only because he recognized the people as spectators. He was prompted to bring it to the attention of the judge only to support additional protective measures for the jury. We conclude in this record that no error clearly capable of producing an unjust result occurred in this context.

*Id.* at 26–27.

The Sixth Amendment guarantees every criminal defendant "the right to a . . . trial[ ] by an impartial jury." U.S. Const. amend. VI. The protections afforded by the Fourteenth Amendment's Due Process Clause have "long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the

extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).

Federal precedent governing when a third party's contact with a jury violates a criminal

defendant's right to an impartial jury includes *Remmer v. United States*, 347 U.S. 227 (1954)

("*Remmer I*"), *Remmer v. United States*, 350 U.S. 377 (1956) ("*Remmer II*"), and *Smith v. Phillips*,

455 U.S. 209 (1982). The Third Circuit explained in *Console*:

> The *Remmer* cases involved a possible attempt to bribe a juror and an FBI interview
> conducted with this juror to investigate the incident. The Court in *Remmer II* held
> that a presumption of prejudice "attaches to the[se] kind [s] of facts." *Remmer II*,
> 350 U.S. at 380. As the Court explained,
>
> > [i]n a criminal case, any private communication, contact, or
> > tampering directly or indirectly, with a juror during a trial about the
> > matter pending before the jury is, for obvious reasons, deemed
> > presumptively prejudicial, if not made in pursuance of known rules
> > of the court . . . with full knowledge of the parties.
>
> *Id.* at 379 (quoting *Remmer I*, 347 U.S. at 229).

*Console*, 13 F.3d at 666.

*Phillips* "involved a juror who applied for a position in the district attorney's office during

a trial. Although the district attorney's office did not respond to the application during the trial, the

defendant claimed that the juror's conduct required the court to impute bias to the juror." *Console*,

13 F.3d at 666. The *Phillips* Court held that "absent proof of actual bias, the juror's relationship

with the government did not require a new trial." *Id.* The *Phillips* case is distinguishable from the

*Remmer* cases because *Phillips* "did not involve a third-party communication with a juror

regarding the matter pending before the jury." *Console*, 13 F.3d at 666 (quotations and citations

omitted).

Thus, if a trial court becomes aware of possible juror bias, it must investigate the source of

the alleged bias, "determine its impact on the juror, and decide whether it was prejudicial." *Remmer*

*I*, 347 U.S. at 230. If allegations of jury bias involve a third party's contact with a juror during a

trial about the matter pending before the jury, the contact is deemed presumptively prejudicial to the defendant. *Remmer I*, 347 U.S. at 229; *United States v. Vega*, 285 F.3d 256, 266 (3d Cir. 2002). However, this presumption of prejudice is not conclusive. *Vega*, 285 F.3d at 266 (citing *Remmer I*, 347 U.S. at 229). The trial court must conduct a hearing to "determine the circumstances, the impact thereof upon the juror, and whether or not [the contact] was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer I*, 347 U.S. at 230. The prosecution has the burden of rebutting the presumption by showing that the "contact with the juror was harmless to the defendant." *Id.* at 229-30. "If [the incident] is found to be harmful," the trial court should grant a new trial. *Remmer I*, 347 U.S. at 229–30. A new trial will only be warranted if the defendant proves that he was actually prejudiced by the improper contact. *Phillips*, 455 U.S. at 215, 217–18.

The Appellate Division's ruling that the trial judge acted within her discretion and correctly found no reason to dismiss any juror was not contrary to or an unreasonable application of these precedents. First, the outside contact with the three impacted jurors did not convey any substantive communication, express or implied, about Manso's case. The outside individuals did not identify themselves; did not assert their allegiance, if any, to the victims or the defendants; did not indicate which way, if any, they may have wanted to influence the jurors; and did not share any information with the jurors, relevant to the case or otherwise. ECF No. 9-20 at 74–80.

Thus, Manso has not established that there was such third-party contact with jurors eleven, thirteen, and fourteen as to prejudice the pending matter. Federal precedent does not mandate a presumption of prejudice. *See, e.g.*, *United States v. Brown*, 923 F.2d 109, 111–12 (8th Cir. 1991) (no presumption of prejudice where spectators supporting defendants "watched from a nearby public seating area when the jurors used the public telephones"; on three occasions the spectators "volunteered greetings and tried to start friendly conversations, but these overtures were ignored

by the jurors"; and "all of the jurors stated on the record that the spectators' presence and actions had not prejudiced them against" defendants); *see also id.* ("Essentially, defendants' claims of jury intimidation are based on nothing more than physical closeness, stares, and rebuffed efforts at conversation. These contacts are neither unique nor uncommon to public trials and do not of themselves trigger the *Remmer* presumption."); *Phillips*, 455 U.S. at 217 ("Due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable."). On this record, the state courts' rulings were not contrary to and did not unreasonably apply Supreme Court precedent.

Second, even if the outside contact constituted communications sufficient to trigger *Remmer I*'s rebuttable presumption of prejudice, that would not change the outcome. The state court objectively and reasonably could have determined that the probable effect of the outside contact did not prejudice Manso's case, as "the presumption of prejudice is effectively rebutted by a juror's credible profession of impartiality." *United States v. Smith*, 319 F. Supp. 2d 527, 533 (E.D. Pa. 2004). Here, each affected juror stated that the incidents would not prevent them from remaining fair and impartial. ECF No. 9-20 at 76–77 (juror fourteen was asked by the trial judge, "Do you feel that, in spite of the fact that someone attempted to speak to you or get information from you, that you are able to remain a fair juror in this case?" to which juror fourteen responded, "Yes, because he didn't say nothing to me, nothing but ask."); *id.* at 77–78 (juror number eleven was asked by the trial judge, "Do you feel you would be able to be a fair juror in spite of the fact that someone attempted to talk to you?" juror eleven responded, "Yes."); *id.* at 80 (juror thirteen was asked by the trial judge, "Do you feel that you have a level of discomfort that would prevent you from being a fair and impartial juror in this trial?" to which juror thirteen responded, "Oh, no, not at all. No. . . ."). Manso thus fails to demonstrate that the Appellate Division's decision was

contrary to, or an unreasonable application of federal precedent or actual prejudice. Accordingly, Ground Five is denied.

### E.  Ground Six: Vague Claim

Manso's asserted sixth ground for relief is as follows: "Improper and confusing jury instructions violated [Manso's] right to due process and a fair trial guaranteed by the United States Constitution." ECF No. 3 at 20. Manso identifies no specific charge or specific language in support of his claim. In fact, he includes virtually no supporting facts for this claim in his habeas petition. ECF No. 3 at 20. The Court is precluded from granting habeas relief based on this vague, generalized assertion. *Anderson v. Pa. Att'y Gen.*, 82 F. App'x 745, 749 (3d Cir. 2003) ("vague and conclusory grounds for habeas relief are subject to summary dismissal") (citation omitted); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991) ("bald assertions and conclusory allegations do not provide sufficient ground" for further inquiry on habeas review); *Mayberry v. Petsock*, 821 F.2d 179, 187 (3d Cir. 1987) (petitioner's vague and general allegations fail to make sufficient showing to justify relief). Accordingly, Ground Six is dismissed.

### F.  Ground Seven: The Failure of the Trial Court to Give a Limiting Instruction on "Propensity" and "Other Crimes" Evidence

In Ground Seven, Manso alleges that the trial court "did not guide the jury by instructing them as to the limited use of other crimes evidence for impeachment and not guilt and the court failed to do the same as to propensity evidence." ECF No. 3 at 21. The Appellate Division addressed and rejected this claim on direct review:

> Defendant argues that it was plain error for the judge to fail to instruct the jury, *sua sponte*, that being a member of the Latin Kings did not constitute other crimes evidence or show a propensity for crime. This argument is totally lacking in merit.
>
> Absent a request for a limiting instruction on this subject, its absence is reviewed under the plain error rule, and the judge infers that counsel perceived the alleged error to be of no moment in the context of the trial. Here it is reasonable to conclude

that the five defense counsels either saw no need for the instruction now urged, or made a tactical decision not to draw attention to the common association of gangs with crime. Defendant does not make a persuasive argument that the omission of this instruction was clearly capable of producing an unjust result.

ECF No. 9-44 at 15–16 (citations and quotations omitted).

"Habeas relief for a due process violation concerning an absent or defective instruction is available when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness." *See Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) (citation omitted). The petitioner bears the burden of demonstrating that the failure to include the limiting instruction was prejudicial. *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). This burden is "even greater than the showing required to establish plain error on direct appeal." *Id.* Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* "[U]nless [the error] had [a] substantial and injurious effect or influence in determining the jury's verdict," it is deemed harmless. *See Adamson v. Cathel*, 633 F.3d 248, 259 (3d Cir. 2011) (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)). If, however, the error did have a substantial and injurious effect or influence, then by definition, the error resulted in actual prejudice. *See id.*

Here, Manso has failed to demonstrate that the omission of a limiting instruction regarding other crimes evidence and propensity infected the entire trial with unfairness. This is clear when viewing the alleged error in the context of the entire trial. *See Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) (stating that whether a constitutional violation has occurred will depend, in part, upon the overall evidence presented in the case). There was strong evidence that Manso was guilty of the charged crimes. *See Manso*, 2015 WL 5038096, at *6 ("The State offered ample, if not overwhelming, proof of [Manso's] guilt."); *see also Dirago v. Hendricks*, No. 03-5943, 2005 WL 3113429, at *15 (D.N.J. Nov. 17, 2005) (omitted instruction on the limited use of "other crimes"

evidence was harmless error, particularly where the Appellate Division determined that "there was overwhelming evidence against petitioner and the case was not 'a close one'").

Further, as the Appellate Division found, it is reasonable to conclude that the five defense attorneys either saw no need for the limiting instruction or made a strategic determination not to attract attention to a common linkage between gangs and crime. ECF No. 9-44 at 15. The trial record suggests that a jury instruction focused on Manso's membership in the Latin Kings may well have done Manso more harm than good. *See, e.g.*, *Buehl v. Vaughn*, 166 F.3d 163, 170 (3d Cir. 1999) (To alleviate the risk that the jury may consider "other crimes" evidence "as proof of bad character or propensity to commit the crime charged," "counsel may request a cautionary instruction." "In some circumstances, such an instruction may be strongly advisable; in others, counsel may reasonably conclude that it is strategically preferable to omit such a request since the instruction might have the undesired effect of highlighting the other crimes evidence.") (citations omitted); *Lee v. Cathel*, No. 05-3279, 2006 WL 2023193, at *9 (D.N.J. July 13, 2006) ("a decision to request or forego a limiting instruction may be a matter of trial strategy"). The omission of the limiting instruction, therefore, was not so prejudicial as to infect the entire trial with unfairness.

Accordingly, the Appellate Division's determination that the absence of a limiting instruction did not deprive Manso of a fair trial is not contrary to clearly established federal law. Manso is therefore not entitled to relief on Ground Seven.

### G.  Ground Eight: Reasonable Doubt

In Ground Eight, Manso argues that the trial court "abused its discretion and committed plain error" because after the jury "announced that it had reached unanimous verdicts with regard to four defendants and then ask[ed] the court to be recharged on the definition of reasonable

doubt," the court failed to "voir dire the jury as to the 'reasonable doubt' standard it applied in reaching its initial verdicts." ECF No. 3 at 22.

In rejecting Manso's claim that the trial court should have conducted voir dire to determine the reasonable doubt standard the jury applied prior to their request for a definition, the Appellate Division conducted the following analysis:

> During deliberations, the judge received a communication from the jury: "'If the jury has come to a unanimous verdict for four of the defendants, but are hung on two charges for the fifth defendant, what will be the resulting actions of the court?'" The judge responded by requiring the jury to continue deliberating, and urged jurors to be open to reexamining their views. Half an hour later, the judge received another communication: "'Number 1, please reread Cake's testimony while at the New Houses. Number 2, please define the phrase 'reasonable doubt.'" The judge provided the requested readback and then responded to the request for a recharge by reading, in full, the model jury charge on reasonable doubt.
>
> [Manso] does not dispute the correctness of the recharge. He contends, however, that the request for a recharge, along with the previous question implying that the jury had already reached a partial verdict, cast doubt on the integrity of the partial verdict and required individual questioning. We are satisfied that the only proper response to the request for a recharge was the recharge given. Judges have been directed not to deviate from the definition of reasonable doubt contained in the model jury charge. *State v. Medina*, 147 N.J. 43, 60–61 (1996), *cert. denied*, 520 U.S. 1190 (1997).
>
> Moreover, judicial inquiry into the jurors' deliberative process is prohibited. *State v. Bisaccia*, 319 N.J. Super. 1, 15 (1999). The exception to that rule for instances where jurors indicate that they are being influenced by extraneous matters (like threats to their lives), *ibid.*, does not apply here. The recharge was proper and no error in this regard occurred.

ECF No. 9-44 at 4–5 (quotations and citations omitted).

The Appellate Division analyzed Manso's claim under New Jersey law and found no error. ECF No. 9-44 at 5. This Court will not disturb the Appellate Division's application of state law. *See Estelle*, 502 U.S. at 67–68.

Manso claims the trial court's failure to "voir dire the jury as to the 'reasonable doubt' standard it applied in reaching its initial verdicts . . . violated [his] right to due process and a fair

trial." ECF No. 3 at 22. "[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992). In the field of criminal law, "the category of infractions that violate 'fundamental fairness' [is defined] very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992). To satisfy due process, Manso's trial must have been fair, but it need not have been perfect. *United States v. Hasting*, 461 U.S. 499, 508–09 (1983) ("[T]here can be no such thing as an error-free, perfect trial, and [ ] the Constitution does not guarantee such a trial.").

Relying on state law, the Appellate Division determined that "the only proper response to the request for a recharge was the recharge given" because "[j]udges have been directed not to deviate from the definition of reasonable doubt contained in the model jury charge," and "judicial inquiry into the jurors' deliberative process is prohibited." ECF No. 9-44 at 4–5. Indeed, Manso conceded in his direct appeal brief that "[i]n both its initial jury instructions and in the supplemental response to the jury, the court's charge on reasonable doubt mirrored the reasonable doubt charge which trial judges have been directed not to deviate from." ECF No. 11 at 46 (citing *State v. Medina*, 147 N.J. at 60–61).

Manso's argument that the jury's request implies it may have applied the wrong standard in its deliberations up to that point is speculative. It is possible the jurors had no doubt as to the guilt of the four defendants for whom they had already reached a unanimous verdict, otherwise they would have requested the court provide the definition of reasonable doubt earlier in their deliberations. Further, assuming the jurors had applied the wrong definition of reasonable doubt earlier in their deliberations, it is reasonable to assume they would redeliberate as to those defendants for whom they had already reached a verdict. *See Weeks v. Angelone*, 528 U.S. 225,

234 (2000) ("A jury is presumed to follow instructions. Similarly, a jury is presumed to understand a judge's answer to its question. . . . To presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer.") (citations omitted).

Manso has not shown that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law. Upon the jury's request to define "reasonable doubt," the trial court took appropriate measures to preserve fair deliberations by re-reading, in full, the model jury charge on reasonable doubt, which the jury is presumed to have understood. Accordingly, Ground Eight will be denied.

### H.  Ground Nine: Motion for Acquittal

In Ground Nine, Manso argues that "the trial court erred in denying [Manso's] motion for a judgment of acquittal at the end of the state's case on the charges of kidnapping." ECF No. 3 at 23. The state court rejected this claim, finding that the evidence presented at trial was sufficient:

> Pursuant to N.J.S.A. 2C:13-1(b), a person is guilty of kidnapping if he "unlawfully confines another for a substantial period," with the purpose "[t]o facilitate commission of any crime or flight thereafter," or "[t]o inflict bodily injury on or to terrorize the victim or another." In order to support convictions for both kidnapping and another crime, the confinement must be more than merely incidental to the underlying crime.
>
> Confinement is more than incidental if it results in an enhanced risk of harm. . . . Taking a victim to a secluded place where assailants may more easily attack without being seen is sufficient to establish the creation of such a risk.
>
> Here, Morante and Cabrera were taken to a secluded section of Branch Brook Park where the attacks on them were not likely to be observed and their cries for help not likely to be heard, thus greatly enhancing the risk to them. Although Omar W. Morante and Cortes escaped before being taken to the site where the attacks were intended to take place, their confinements also enhanced the risk of harm by isolating them from their families, friends and neighbors.

ECF No. 9-44 at 6–7 (citations omitted; alterations in original).

In reviewing claims that trial evidence was insufficient for a conviction, habeas courts ask whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard gives due regard to the factfinder's ability to view the evidence, resolve conflicts, and draw reasonable inferences. *Id.* The reviewing court does not re-weigh the evidence or re-determine the credibility of witnesses whose demeanor the factfinder has observed. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Determination of witness credibility is within the factfinder's sole province and is not subject to review. *Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995).

New Jersey law is consistent with these principles as to review of acquittal motion rulings. *See, e.g.*, *State v. Valdez*, No. 2708, 2017 WL 3318303, at *3 (N.J. Super. Ct. App. Div. 2017) (when considering a motion for judgment of acquittal, the trial court is to determine "whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable [factfinder] could find guilt of the charge beyond a reasonable doubt"); *State v. Samuels*, 914 A.2d 1250, 1254 (N.J. 2007) (internal citations omitted). The court must view the evidence most favorably to the State, and ought not be concerned with the weight of the evidence. *See, e.g.*, *State v. Reyes*, 236 A.2d 385, 388 (N.J. 1967); *State v. Muniz*, 375 A.2d 1234, 1235–36 (N.J. Super. Ct. App. Div. 1977).

Thus, in Ground Eight, to demonstrate a wrong sufficient to warrant habeas intervention, Manso would have to show that, in violation of his due process rights, the record was devoid of evidentiary support for his kidnapping convictions. *See Cunningham v. Maroney*, 397 F.2d 724, 725 (3d Cir. 1968). He has not done so. To the contrary, the record reflects an abundance of

evidence demonstrating Manso's guilt: At the June 29, 1998, Orange Crush meeting at Romero's house, Juan DeJesus overheard Romero and Rivera trying to dissuade Manso from carrying out Byrd's order to kidnap and kill the intended victims, but Manso responded that "an order is an order." *Manso*, 2015 WL 5038096, at *2. Manso and co-defendants left the meeting at Romero's home, in vehicles with the four intended victims. *Id.* Manso used the pay phones at an interchange on the New Jersey Turnpike to call Byrd and confirm that their orders were to carry out the punishment without a trial. *Id.* Luis Rodriguez asked to speak to Byrd to persuade him that a trial was necessary, but Manso told him Byrd refused to reconsider the issue and when Manso hung up the phone, he said, "[Byrd] said we got to do this." *Id*. Once at Branch Brook Park, Manso said, "Set it off," after which the attack began. *Id*.  Manso directed Diaz to drag Cabrera's body to the water and ordered Luis Rodriguez to help Perez drown Morante. *Id.* The brothers were beaten and strangled to death and left lying face down in the water. ECF No. 9-43 at 9. Manso did not proffer evidence contradicting the above testimony; rather he argued that all of the witnesses against him were lying.

On this record, it was objectively reasonable for the state courts to find sufficient evidence to support kidnapping charges against Manso. *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) ("[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.") (quotations and citations omitted). Thus, the Appellate Division's decision was not contrary to or an unreasonable application of relevant Supreme Court precedent. As Manso has not demonstrated a wrong of constitutional dimension sufficient to warrant federal habeas relief, Ground Nine will be dismissed.

## V.      CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, reasonable jurists would not find the Court's habeas ruling debatable. Accordingly, no certificate of appealability shall issue.

## VI.     CONCLUSION

For all of the foregoing reasons, Manso's petition is denied with prejudice on the merits and no certificate of appealability shall issue.  An appropriate order follows.

DATED:  March 31, 2023

s/ Claire C. Cecchi
_____
**CLAIRE C. CECCHI, U.S.D.J.**